UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

DENISE SAM-SEKUR,

                *Plaintiff,*

        v.

THE WHITMORE GROUP, LTD.,

                *Defendant.*

---

Docket 11-cv-04938-JFB-GRB

United States Courthouse
Central Islip, New York

December 19, 2012
2:19:55 p.m. - 3:38:31 p.m.

TRANSCRIPT FOR CIVIL CAUSE
- DEFENDANT'S MOTION TO DISMISS:
ARGUMENT AND DECISION -
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

*For Plaintiff:*           DENISE SAM-SEKUR
                      122 Rocklyn Avenue
                      Lynbrook, New York 11563
                      516-426-6856
                      PRO SE

*For Defendant:*          DIANE KREBS, ESQ.
                      Gordon & Rees LLP
                      90 Broad Street, 23rd Floor
                      New York, New York 10004
                      212-269-5500; 212-269-5505 fax
                      dkrebs@gordonrees.com

*Transcriber:*           AAA ELECTRONIC SOUND REPORTERS
                      1133 Broadway, Suite 706
                      New York, New York 10010
                      888-866-5135; 888-677-6131 fax
                      electronicsound@court-transcripts.net

*(Proceedings recorded by electronic sound recording)*

1          COURTROOM DEPUTY:  Calling 11-cv-4938, *Sam-Sekur v.*

2   *The Whitmore Group, Ltd.*  Please state your appearances for the

3   record.

4          MS. SAM-SEKUR:  My name is Denise Sam-Sekur.  As of

5   2008, legally, Denise Sam.

6          MS. KREBS:  Diane Krebs, from Gordon & Rees.

7          COURTROOM DEPUTY:  Just make sure the green light is

8   on.

9          MS. KREBS:  What?

10         THE COURT:  The green light's not on.  Press the

11  button.

12         MS. KREBS:  Better?

13         THE COURT:  Yes.

14         MS. KREBS:  Diane Krebs, from Gordon & Rees, for the

15  Defendant, Your Honor.

16         THE COURT:  Okay.  Good afternoon.  As you know, I

17  called you both in here because we have the Defendant's pending

18  motion to dismiss the amended complaint, and Ms. Sam-Sekur, in

19  her opposition to that motion requests leave to amend so that

20  she can re-plead claims under the Family Medical Leave Act.  So

21  I want to address both of those things today.  And then take it

22  from there.

23         Okay, I'm going to let Ms. Krebs go first; it's the

24  Defendant's motion to dismiss.  So you can add anything you want

25  to add to your papers.  Obviously, I've read your papers, so you

1   don't have to go through everything in there.  You can highlight

2   anything you'd like to highlight.

3        MS. KREBS:  Thank you, Your Honor.  Yeah, I think that

4   our papers for the most part encompass what needs to be said.  I

5   think Ms. Sam, as she has requested to be called, since her name

6   is now legally Ms. Sam.  Ms. Sam has indicated in her opposition

7   papers that she is not seeking to assert a claim under the PDA,

8   so that claim is a non-issue which leaves only the claim under

9   the ADA.

10       And as we've indicated, it seems quite difficult to

11  consider her having made a claim under the ADA that is viable

12  given the fact that among other things, there was no diagnosed

13  disability at the time that she ceased working for the

14  organization.  And so if she didn't know she had a disability,

15  how could the organization possibly know that she had a

16  disability?

17       Also, Ms. Sam did not specifically address the

18  question of her harassment claim to the extent that one exists,

19  so we have assumed on reply that any such claim that might have

20  been asserted was abandoned.  But in any event, it does seem to

21  be clear that it does not sustain a claim.

22       The only other issue I wanted to mention specifically

23  with regard to the harassment claim which was not identified in

24  our original papers, is that it also does appear that those

25  incidents that she identifies are spread out, disparate, not

1  really connected with each other.  And almost all of them,

2  except for I think for the very last one, are time barred

3  because they are outside the 300 days prior to her filing her

4  EEOC charge.  We did not stress that point in our papers,

5  because I think quite frankly I think the other arguments stand

6  on their own, but I did want to just point that out.

7          THE COURT:  Although for hostile work environment

8  purposes, you obviously can utilize things that are both within

9  the statute of limitations and outside.

10          MS. KREBS:  Potentially, if they are considered one --

11          THE COURT:  Right.

12          MS. KREBS:  -- one --

13          THE COURT:  Pattern.

14          MS. KREBS:  Right.  If they are considered one

15  continuous --

16          THE COURT:  Right.

17          MS. KREBS:  -- situation of harassment, which is of

18  course one of the reasons why we didn't stress that in our

19  papers anyway.  But in addition, I do think it's worth pointing

20  out that given how separated they are and how dissimilar they

21  are, an argument certainly could be made that they are actually

22  not a pattern, and therefore the first three fall outside the

23  scope.

24          THE COURT:  Okay.  Why don't you address her request

25  for leave to re-plead the Family Leave Act claims?

1          MS. KREBS:  Sure.  Thank you, Your Honor.  I

2   understand that Ms. Sam is pro se and therefore one tries to

3   bend over backward and give pro se's every opportunity to try

4   and take advantage of the system.  However, I believe that there

5   is also an obligation on every plaintiff, pro se or not, to do

6   some sort of a due diligence and try to encompass the claims

7   that they believe that they can bring at the beginning of the

8   case.

9          And I understand that if there's anything in the

10  complaint, that it appears that it could try and restate a valid

11  cause of action, one would try and give them that opportunity.

12  But at the same time, it almost seems like it's a string bet

13  here, where she brings up a statute, the statute is not viable

14  in the way that she alleged it, so the Court gave her

15  opportunity to re-plead that claim.  She tried to re-plead that

16  claim.  We have demonstrated, I believe, that that claim is not

17  valid.  And now all of a sudden out of nowhere she's bringing up

18  a completely new claim.  And so at a certain point it sort of

19  has to stop.

20          And we did cite several cases in our reply papers,

21  after learning that Ms. Sam wanted to re-plead yet again, that

22  identified that at least once you've given even a pro se

23  plaintiff an opportunity for leave to re-plead, and that still

24  does not sustain a claim that it is certainly within the Court's

25  discretion and entitlement to dismiss with prejudice at that

1  point in time, particularly when there is no proposed amended

2  complaint that's filed with it.  So for that reason we believe

3  that under these circumstances Ms. Sam should not be given leave

4  to re-plead and add a completely new claim in that's sort of

5  coming in out of nowhere, and that the complaint should be

6  dismissed with prejudice.

7         To the extent of course that Your Honor chooses to go

8  a different route with that, we obviously would be reserving our

9  rights to make a motion to dismiss on substantive grounds once

10  we would see what the complaint was.  So I don't want our

11  argument here to be viewed as a waiver of any substantive

12  arguments that we might have with respect to a purported FMLA

13  claim.  But as I said in my papers, I just don't think we should

14  even be getting to that point.

15         THE COURT:  Okay.  Thank you.

16         MS. KREBS:  Thank you, Your Honor.

17         THE COURT:  Okay, Ms. Sam, you can respond.

18         MS. SAM-SEKUR:  Okay.  Excuse me, Your Honor.  I am

19  actually respectfully requesting to add an FMLA claim following

20  the judge's rules per my faxed request to add FMLA under FRCP

21  15.  I was not aware, nor was I made aware by my employer, that

22  one year upon my return that I was entitled to family medical

23  leave as everyone in the office was fully aware of medical

24  conditions, as well as my daughter's asthma.  And I consulted

25  with an attorney who advised me of this right and this is why I

1  am now aware, and I am now requesting respectfully for you to

2  add that claim, please, sir.

3          In addition to that I'd still like to assert my

4  disability claim for a series of medical problems post

5  pregnancy, in accordance with the 2008 revision.  My doctors

6  told me that most of my symptoms were related to my chronic gall

7  bladder disease which makes perfect sense since I've been sick

8  from April 30, 2009 till the day of my gall bladder removal

9  which was May 23, 2011.  All of my symptoms left and I've

10  returned to normal.

11          However in the process of elimination there were

12  things such as an oral implant, which I have in my purse if

13  you'd like to see which was removed from my mouth; an IUD which

14  was infected and removed.  There were various blood tests; there

15  were various sonograms, which I provided to the Defendant's

16  attorney, as well as providing to the Court to show that there

17  was something in fact wrong with me.

18          I was not officially diagnosed with chronic

19  cholecystitis until April of 2011, which makes it rather

20  impossible for me to alert Whitmore as I kept George Custance

21  and Diana Bertoni, my immediate supervisors, as well as

22  Geraldine Schnatz, the Human Resources Director, aware.  And

23  I've kept records of everything.  And then when I had received

24  the threat that if I was sick one more time, when I had left the

25  office and I was at home waiting for my daughter's asthma

1  nebulizer, within 48 hours I was dismissed based upon grounds of

2  downsizing, which I later found out that was untrue.

3         There was another woman who was terminated for

4  misconduct in addition to Ms. Darcy Pearson, and there was an

5  ex-employer, called back and I was not one of those people that

6  were called back.  In addition there was an M. Flood that was

7  hired in my place.  And, Your Honor, in addition to that there

8  are about five other new hires that were able to keep their

9  jobs.

10        I have to admit that I did not receive, when Ms. Krebs

11  contacted me last evening to confirm that I would be in the

12  court today, I did advise her that I do not receive their reply

13  to my November 26 correspondence.  She did give it to me.

14  Obviously I didn't have time to read it.  However, Ms. Vulkavich

15  (ph) was kind enough to read it to me.  And in the past week, I

16  have sent a letter to the Court, which I'm hoping you received,

17  and I've cc'd the letter, and I also have the letter with me.

18        THE COURT:  In response to the reply you mean?

19        MS. SAM-SEKUR:  In response to the reply.

20        THE COURT:  Yeah, I don't think I've seen that.  You

21  want to hand that up?  Have you seen that, Ms. Krebs?

22        MS. KREBS:  No, I haven't.  And just so you know, Your

23  Honor, we had -- it's my understanding that we had served our

24  reply on Ms. Sam.  I don't know how it is that she didn't get

25  it.  We also obviously filed it ECF.

1          THE COURT:  Right.  Okay, well, she's reviewed it now.

2   But I want to see your response to that.

3          MS. KREBS:  Certainly.  Your Honor, do I --

4          THE COURT:  Yeah, you can hand it up and we'll make a

5   copy for Ms. Krebs.

6          (Pause.)

7          THE COURT:  Okay.  Is there anything else you want to

8   add, Ms. Sam?

9          MS. SAM-SEKUR:  I just -- Your Honor, thank you.  I

10  would just like to reiterate that I do have -- have sent in --

11  reiterate that I have sent in many blood tests, sonograms.  If

12  you feel that you need any additional documentation, I would be

13  absolutely delighted to provide it.  And thank you for having me

14  in your courtroom.

15         THE COURT:  Well, let me just ask you; Ms. Krebs, as

16  you heard, made the argument today and in her papers that they

17  can't possibly be guilty of disability discrimination if they

18  didn't know that you were suffering from a disability until

19  after -- if you didn't know that you were suffering from a

20  disability until after you were terminated.  What's your

21  response to that?  Do you have a response to that?

22         MR. SAM-SEKUR:  My response is that I was out several

23  times because I was being tested to see what was wrong with me,

24  and that was when the threat came in if I was out sick again I

25  would lose my job.  I was taking blood tests; I was sonograms;

1  things of that nature which I reported all to Diane Bertoni and

2  George Custance, so they were well aware.

3          I even left on my lunch hour to have a breast biopsy

4  and returned to the office in an ace bandage.  So everybody --

5  it's a very small office.  People in that type of atmosphere

6  tend to the gossip rather than to the work, so everybody was

7  well aware, especially in my department, that something was

8  going on, and that I was being tested.  Had I been able to stay

9  at Whitmore, everybody would have seen the proof of that in

10  addition to the pathology report from the surgery that I had

11  provided, sir.  Thank you.

12          THE COURT:  Okay.  Do you want to respond to anything,

13  Ms. Krebs?

14          MS. KREBS:  Just very, very briefly.  And I think that

15  Ms. Sam's statement that it was impossible to alert Whitmore

16  with respect to the existence of a disability or diagnosis

17  because she didn't have one until May of 2011 is quite telling.

18  And I understand what Ms. Sam is saying is that there were times

19  that she was out and she wasn't feeling well or she was out

20  being tested, but the fact of the matter is that the ADA does

21  not cover anybody being out just because they happen to be sick.

22          You have to be out due to a covered disability; that

23  covered disability has to be known to the employer; and the

24  employer has to take action based on it.  And based on her own

25  description of events, there was no -- at the time that Whitmore

1  terminated her, there was no tying anything together to give

2  them a semblance that what she had was a disability.

3       Your Honor has already ruled that with respect to the

4  other separate incidents such as the breast biopsy or I believe

5  she mentioned an implant in her -- an oral implant that was

6  removed or an IUD that was removed.  All of the things do not

7  constitute a disability.  So the only question here is whether

8  or not she had chronic cholecystitis, I think I pronounced that

9  correctly, and her own testimony makes it clear that there was

10  no way for Whitmore to have known that.  In fact, she didn't

11  know that.

12       THE COURT:  Well, I guess her argument is that even if

13  it wasn't diagnosed until later, that they could have been

14  aware, according to her, of a substantial impairment.  Or I

15  guess it could even be a regarded as claim that they were

16  regarding her as being substantially impaired from her daily

17  functioning even if the formal diagnosis didn't come until many

18  months later.  I think if I were to articulate for a pro se what

19  I think she's trying to argue, that would be how I would

20  articulate it.

21       MR. KREBS:  I understand that, Your Honor, but I just

22  don't think that that is sustainable in this situation.  First

23  of all, she has, herself, admitted that there were a whole bunch

24  of separate little things that were going on, each of which Your

25  Honor has already ruled is not a disability.  And that she

1   advised Whitmore that all of her different absences and the

2   things that were going on were attributable to each one of those

3   other separate things.  So a person can't be regarded as having

4   a disability if they're being told that they are connected to

5   other things that are not disabilities.

6          In addition, again, the fact that she said that she

7   wasn't feeling well and she was being tested, but she wasn't

8   getting any results that were indicating a disability, and she

9   didn't advise Whitmore of any results that would indicate that

10  there was even a hint that there was a disability.  And in fact

11  if you look at the testing that she did, the only testing that

12  she has provided that existed prior to her termination from

13  Whitmore was unremarkable.  There was no indication that there

14  was a finding that would indicate an underlying condition.

15         Just to go through the fact pattern in that regard,

16  she indicates there was a sonogram on June 4, 2010, which by the

17  way she doesn't indicate she ever showed to Whitmore.  But the

18  result of that sonogram was an unremarkable abdominal sonogram.

19  So it's difficult to envision how one could possibly even argue,

20  even a regarded as claim when there is simply no indication that

21  there was any underlying situation that one could potentially

22  regard as a disability.  In fact to the contrary, there was

23  evidence indicating that there wasn't.

24         So, I understand the inclination to try and bend over

25  backwards for a pro se plaintiff and to try to give them a

1    benefit of the doubt, as any plaintiff should get, pro se or

2    not, but given the facts that have been asserted and

3    demonstrated in her pleadings, we just don't believe that there

4    is any basis for arguing any sort of ADA claim at this time, and

5    that there would be no capacity for doing so.  Now that she's

6    had a chance to re-plead and provide additional information,

7    everything that she has provided points in the opposite

8    direction.

9         THE COURT:  Okay.  I'm going to take -- I want to take

10   -- we have a criminal case I think that's ready.  Is everybody

11   here on the criminal case?

12        COURTROOM DEPUTY:  Yes, Your Honor.

13        THE COURT:  So, we should take a ten minute break and

14   then I'm going to place my ruling on the record.  If you could

15   just wait ten minutes, okay?

16        MS. SAM-SEKUR:  Certainly.

17        THE COURT:  Thank you.

18        MS. SAM-SEKUR:  Thank you, Your Honor.

19        MS. KREBS:  Thank you, Your Honor.

20        (Off the record.)

21        THE COURT:  I apologize for keeping you waiting, but I

22   want to place the Court's ruling on the record now.  Are we on

23   the tape?

24        COURTROOM DEPUTY:  Yes.

25        THE COURT:  Okay.  First with respect to the motion to

1  amend to add the FMLA claims, I'm going to grant that motion.

2  That's obviously within the Court's discretion.  The standard is

3  clear that absent undue delay, bad faith or dilatory motive on

4  part of the movement, or repeated failure to cure deficiencies

5  by amendments previously allowed, or undue prejudice to the

6  opposing party by virtue of the amendment, or futility of the

7  amendment, the rule requires that leave should be freely given.

8  *Foman v. Davis*, 371 U.S. 178 (Supreme Court 1962).  And there

9  are numerous second circuit cases that lay out that standard,

10  including *Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84 at page

11  101 (2d Cir. 2002).

12       Under that standard, there's no indication of any bad

13  faith or dilatory motive on the part of the pro se plaintiff

14  here.  It is clear to me that this is simply based upon a pro se

15  status and not being clear on what federal statutes are

16  available to her with respect to the issues that she is

17  alleging.  So I have no reason to believe that has been

18  purposely bringing claims piecemeal.

19       Obviously I understand that the Defendant has already

20  made a motion to dismiss, but this is not as if the Court

21  identified defects in the Family and Medical Leave Act claim and

22  she failed to remedy them.  It was a potential claim that was

23  not identified initially by the Pro Se Plaintiff and one that

24  the court did not liberally construe as being part of the

25  complaint or the amended complaint.

1       So in light of the Plaintiff's pro se status,

2   notwithstanding the fact that she has already filed one amended

3   complaint, I believe she should have the opportunity to add

4   those claims without prejudice to Defendants.  Obviously

5   reviewing the amended complaint and making a motion to dismiss

6   if they believe that there's some basis.

7       I've obviously looked at the allegations as they are

8   laid out in the opposition and their proposed motion.  It's not

9   the actual amended complaint, but if I saw some glaring defect

10  that made be believe that the amendment would be futile on its

11  face, I obviously would consider that, but there's nothing that

12  leads me to believe that she could not articulate a plausible

13  claim under the FMLA that would survive a motion to dismiss.

14      Moving to the motion to dismiss the current disability

15  claim, I'm going to deny that motion.  It is a close question.

16  Obviously I granted it the first time and required the Plaintiff

17  to put in the amended complaint.  However, in the amended

18  complaint, putting aside the other issues, which I agree with

19  Ms. Krebs on the other issues, they certainly would not qualify

20  as disabilities, the other illnesses.

21      There's really no regarded as claim as it relates to

22  those because it wasn't a mystery to the employer.  The employer

23  knew what those conditions were.  So there is no plausible claim

24  that they were regarding any of those other illnesses as

25  something more serious than they were being represented by the

1   Plaintiff.  There's just no evidence of that.

2           However, with respect to the one condition that the

3   Court focused on in the initial opinion, the Plaintiff has put

4   in some evidence that notwithstanding the fact that it wasn't

5   officially diagnosed until after her employment that there were

6   at least some effects of that condition that were -- again as

7   alleged -- were manifesting themselves within several weeks of

8   the pregnancy.  I believe it was five weeks after the pregnancy

9   she alleges that there was some indication that she was

10  suffering from some identified illness which she sought

11  treatment for which then over the many months, obviously later,

12  was diagnosed in terms of giving -- diagnosed with a name of

13  chronic cholecystitis.

14          I understand the argument that it wasn't diagnosed

15  until after she was terminated, but the law does not require

16  that a disability be identified by name for it to potentially

17  quality as a disability.  The question would be whether or not

18  the disability existed during the employment or at the time of

19  termination, or whether it was regarded as existing based upon

20  the circumstances surrounding some of the manifestations of that

21  during the employment.

22          It does not appear to me to be a particularly strong

23  case for that, however, the case law is clear that typically

24  those types of issues of whether or not something would be a

25  disability or whether the employer regard it as a disability,

1   it's difficult to address those at the motion to dismiss stage

2   without the benefit of discovery.  So it's my view that there

3   should be discovery with respect to that claim.  And then

4   obviously the Defendants at the summary judgment stage can make

5   a motion where the Court will then have a full record as to what

6   information was fully available to the employers, and more

7   information regarding the nature of the condition and the

8   manifestations of that condition during the time of the

9   employment.

10          So for those reasons I'm allowing the ADA claim to go

11  forward, and I'm going to allow the Plaintiff to add the FMLA

12  claims.  How long will you need to file the second amended

13  complaint?  Can you do that in mid-January?

14          MS. SAM-SEKUR:  Certainly.

15          THE COURT:  So, we'll say January 15 for the second

16  amended complaint.  And then Ms. Krebs, I'll just ask of you by

17  -- I'll give you two weeks to review it.  You can send me a

18  letter we'll say by January 29 indicating if your client wants

19  to file another motion to dismiss.

20          I just want to make clear what you should do, Ms. Sam.

21  The ADA claim, I've already said, survives a motion to dismiss

22  so basically you can take the amended complaint you filed and

23  just put on top of it second amended complaint.  And put

24  additional claims and allegations related to the FMLA so that

25  this way it will be one document that will have both the ADA

1    claim in it, as well as what you're going to add.  Do you

2    understand what I'm saying?

3              MS. SAM-SEKUR:  Yes.

4              THE COURT:  So take the amended complaint you've

5    submitted and just on top of it put additional papers indicating

6    second amended complaint with the additional allegations and

7    claims under the FMLA.

8              MS. SAM-SEKUR:  Your Honor, may I attach further

9    medical documentation to that?

10             THE COURT:  Yes.

11             MS. SAM-SEKUR:  Thank you, Your Honor.

12             THE COURT:  Okay.  And then by that deadline, Ms.

13   Krebs, if your client wants to make the motion to dismiss the

14   FMLA claims, you can let me know and I'll set a schedule for

15   that.  I would just ask you and your client to consider, given

16   the fact that the disability claim is going to go forward, I'm

17   not sure in terms of discovery that from a practical standpoint

18   of the costs or the discovery to your client are going to be any

19   greater if they waited till summary judgment for the FMLA

20   claims.  I don't think the discovery is going to be much

21   different.

22             MS. KREBS:  I don't know, Your Honor, because I

23   haven't seen what the claim is supposed to be referring to.  For

24   all I know she is going to bring up other sorts of illnesses

25   that could extend the scope of discovery.  In which case --

1                THE COURT:  Okay.

2                MS. KREBS:  -- it would be worth it.  But Your Honor

3    may I ask?

4                THE COURT:  Yes.

5                MS. KREBS:  I have two questions.

6                THE COURT:  Yes.

7                MS. KREBS:  First, I'm going to be out of the country

8    staring on the 19th and the 29th is my first day back.  So I'm

9    out for --

10               THE COURT:  That's fine.

11               MS. KREBS:  -- a week.  Is it possible to move that

12   date a little bit?

13               THE COURT:  Yes.  February 8?

14               MS. KREBS:  That will be great.  Thank you, Your

15   Honor.

16               THE COURT:  What's the other?  You said you had two

17   questions?

18               MS. KREBS:  I just wanted to -- I had a question of

19   clarification on your ruling with respect to the ADA.

20               THE COURT:  Yes.

21               MS. KREBS:  From what I can tell -- first of all,

22   there were I guess three potential types of ADA claims here.

23   One was potentially harassment, which again was never

24   specifically addressed; one was direct disability; and one was a

25   regarded as disability.  And I'm unclear as to --

1          THE COURT:  Yeah, I'm allowing the direct disability

2    claim and the regarded as claim both to go forward.  With

3    respect to the harassment claim, I agree, I'm not permitting

4    that to go forward.   It is not a plausible claim.  Assuming

5    that you can assert a hostile work environment claim pursuant to

6    the ADA, the standard would be the same as it would be for a

7    Title VII which is well settled under numerous cases, including

8    *Patane v. Clark*, 508 F.3d 106 (2d Cir. 2007).

9          There must be a sufficiently -- the work environment

10   must be sufficiently severe -- the harassment must be

11   sufficiently severe, pervasive, such that a reasonable person

12   could find it hostile.

13          And in this particular case, as alleged in the amended

14   complaint, there are sporadic instances, four of them over a

15   long period of time, and they certainly, even if proven, would

16   not as a matter of law rise to the level that would be necessary

17   to sustain a rational or plausible claim for a hostile work

18   environment.  They're separated by long periods of time.

19          In terms of the type of allegations, one is not

20   receiving a baby shower.  These are not the types of allegations

21   that would qualify either individually or collectively for a

22   hostile work environment claim under the ADA.  So that portion

23   I'm dismissing.  Okay?

24          MS. SAM-SEKUR:  Your Honor?

25          THE COURT:  Any other questions?

1           MS. SAM-SEKUR:  Yes.  Excuse me, Your Honor; since Ms.

2    Krebs is going to be detained in responding, does that change

3    the date of my --

4           THE COURT:  Yeah, if you want -- do you want, since

5    she's going to be away, you want a little bit more time?

6           MS. SAM-SEKUR:  May I please?

7           THE COURT:  Yeah, if she's going to be away.  When do

8    you say you're coming back, Ms. Krebs?

9           MS. KREBS:  January 29 is my first day back.

10          THE COURT:  So, you're not going to be able to review

11   it till you come back?

12          MS. KREBS:  Right.

13          THE COURT:  So, you want January 29?

14          MS. SAM-SEKUR:  May I, Your Honor?

15          THE COURT:  Yeah.  That's fine.

16          MS. SAM-SEKUR:  Thank you.

17          THE COURT:  Okay.  And then February 8 -- if your

18   client does decide that it doesn't make sense to try to move to

19   dismiss, again, I would prefer to just reserve until summary

20   judgment.  You can just advise me of that in the letter and

21   propose a reasonable date for the answer and I'll so-order that

22   date assuming it's reasonable.  Okay?

23          MS. KREBS:  Okay.  Your Honor, may I ask one more

24   question of clarification?

25          THE COURT:  Mm-hm.

1          MS. KREBS:  On the question of -- not the regarded as

2     claim, but on the direct disability claim, I was just hoping you

3     could provide just a bit more explanation or guidance with

4     respect to the substantially limiting major life activities that

5     would -- what major life activity was substantially limited

6     according to the allegations in the complaint?

7          THE COURT:  Well, that's going to be -- she's alleging

8     that it did limit her activities and that's going to be part of

9     the discovery.  You can obviously depose her and ask her what

10    particular activities that it was affecting.  And if the

11    evidence does not support that it was affecting her life in any

12    significant way at the time of her employment, then that would

13    be the grounds for summary judgment.  But I'm liberally

14    construing her complaint to be alleging that.  And that is

15    typically when there's evidence of a condition as there is here

16    that questions typically one for summary judgment because I

17    certainly don't have a complete record on that at this point.

18         But I just want to make clear, I think this is clear,

19    but this is related to the chronic -- I keep mispronouncing it.

20         MS. KREBS:  Cholecystitis.

21         THE COURT:  Right.  Not the other issues.  The other

22    issues certainly would not qualify as disabilities.  Okay?

23         MS. SAM-SEKUR:  Thank you, Your Honor.

24         THE COURT:  Okay.

25         MS. KREBS:  Thank you, Your Honor.

1          THE COURT:  Have a good day.

2          MS. SAM-SEKUR:  Have a happy holiday.  Thank you for

3    having me.

4          THE COURT:  You too.

5                         - o0o -

CERTIFICATION

I, Rochelle V. Grant, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated:  January 8, 2013

_____
Rochelle V. Grant